**UNITED ACQUISITION CORP., Plaintiff,**

v.

**BANQUE PARIBAS, Banque Paribas Suisse, S.A. and the Royal Bank of Canada, Defendants.**

No. 85 Civ. 9602.

United States District Court, S.D. New York.

Dec. 18, 1985.

David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City, for plaintiff.

Irwin H. Warren, F. Josiah Leicht, Weil, Gotshal & Manges, New York City, for defendants.

## MEMORANDUM AND ORDER

WALKER, District Judge.

### Introduction

Plaintiff United Acquisition Corp. ("UAC") seeks the aid of this court to enforce what it claims to be a binding contract to purchase all of the stock of United Refining, Inc. ("URI") from the defendants, Banque Paribas ("Paribas"), Banque Paribas Suisse, S.A. ("Paribas Swiss") and the Royal Bank of Canada ("Royal Bank"). Specifically, plaintiff seeks an order enjoining defendant from selling any stock of URI or its URI's subsidiaries to any third parties. The plaintiff's request for a temporary restraining order was denied on December 9, 1985, and the trial on the permanent injunction and the preliminary injunction was ordered consolidated pursuant to Rule 65(a)(2) and scheduled for December 13, 1985. On that date, the court received evidence in the form of depositions and exhibits and heard argument. The deponents were offered for cross-examination which was waived. The court has carefully reviewed the evidence including a word by word reading of the depositions.

### Facts

URI is a holding company which owns all of the issued stock of its operating company, United Refining Company ("URC") with headquarters in Warren, Pennsylvania. URC in turn has two wholly-owned subsidiaries: United Refining Company of Pennsylvania and Kiantone Pipeline Corporation. (Jacquet Aff.)[1]

Prior to any of the events relevant to this action, Coral Petroleum Corporation ("Coral") owned all of the shares of URI and pledged the shares as collateral on a $35 million loan from defendants to Coral. (Jacquet 17) The participations were as follows: Paribas, $14½ million; Royal Bank, $10½ million and Paribas Suisse $10 million.

When Coral defaulted on the loan, the defendants foreclosed on the URI shares. In August 1985, the defendants purchased the shares at a public foreclosure sale using a subsidiary TPL Corporation ("TPL") to purchase the stock (Aiello 21, Jacquet Aff. 2) The stock of TPL is owned by the defendant banks in proportion to their participations in the original loan to Coral. (Aiello 10–12) The TPL board of directors consists of Ralph J. Aiello, Vice President and General Counsel of Paribas, and Timothy L. Porter, a member of the legal department of Paribas (Aiello 10). URC and its subsidiaries are now in bankruptcy. (Jacquet Aff. 2)

Upon acquiring URI, the defendants placed their representatives on the Board. At about the same time, Michel Jacquet, Executive Vice President and General Manager of the New York branch of Paribas, concluded that it was necessary to appoint new management, on a temporary basis, for URI. (Jacquet 43) Jacquet had been engaged in general discussions with Joe A. Ris, a manager experienced with companies in bankruptcy and reorganization. (Ris 22) Ris and Jacquet, had served together for six months in the French Foreign Legion in 1961. (Jacquet 7) The two former officers had been out of contact for twenty-four years, until they met in a restaurant in May, 1985, decided to renew their relationship and began to discuss whether there was any possibility of Ris assisting the bank in some capacity. (Jacquet 23, 29).

1. Each such reference is to the page of the deposition given by the named deponent. Other references are to the affidavits submitted by the parties, exhibits thereto and exhibits attached to Plaintiff's Supplemental Memorandum (PSM).

The two men discussed possible assistance by Ris with two problem companies that Paribas controlled: Land-Sea, a west coast oil terminal owner, and MRW, a restaurant management concern. (Jacquet 29) While nothing came of the discussions regarding Land-Sea, Ris was authorized to find a buyer for some of the MRW restaurants. (Jacquet 40, 81, 82)

Sometime during the month before October 10, 1985, Jacquet interested Ris in managing URI on a temporary basis. (Jacquet 43, 44) They agreed that Ris would have no contract and that his employment would be terminable at will. The two men settled on a compensation figure of $60,000 per month for a minimum of six weeks. Although the figure seemed high, it made "allowance for the fact that we required from Mr. Ris to spend an important part of his time in Warren, that he had to release most if not all of his present duties, and that ... his employment could be terminated immediately." (Jacquet 47; PSM Ex. 1)

Aside from the responsibility of Ris for managing the insolvent company, Ris and Jacquet differ in their depositions as to the role Ris was to play in securing a buyer for the URI stock. Jacquet maintains that while it was clear that URI was for sale, no specific role for Ris as a finder arose until one month after Ris began work when Ris on November 10, 1985 told Jacquet he had a buyer. (Jacquet 49) Ris testified that as of early October it was his understanding that he was to find a buyer. (Ris 14) In any event, at a board meeting on October 10, 1985 Ris was appointed President and CEO of the operating companies. (Ris 7)

At about the same time that Ris was being brought in to manage the companies, but before he began work, Ed Guinan of the Guinan Company sent a written offer to Paribas for the purchase of the shares of URI according to Jacquet. (Jacquet 58) Ris was told that his appointment was on hold pending this offer. (Jacquet 57, 58, 59) The Guinan offer was for $4 million with a warrant to purchase back 10 or 15 percent of the stock. (Jacquet 59) This offer, unlike other offers had "no strings attached", that is, no requests for representations or warranties. (Jacquet 58) Jacquet and Gough, the man who discussed this offer with the banks, agreed on the price. Next, according to Jacquet, the purchasers were to wire the funds the next working day to the bank in order to give evidence of the funds and then the two parties would sit down and write up the agreement. The funds were never wired and the deal collapsed. (Jacquet 59)

Jacquet telephoned Ris the day after Columbus Day (Columbus Day was observed on Monday, October 14, 1985) to inform him that the proposed sale to Guinan had come to naught and that he could begin work immediately. (Jacquet 64)

Prior to the Guinan offer, the banks had, according to Jacquet, received a written offer from a Thomas Shiah. (Jacquet 65) The banks rejected this offer because it (1) entailed a long due diligence period and (2) required the banks to make representations and warranties they were not prepared to accept. These terms were unacceptable because the banks had owned URI for a short period of time and were unwilling to accept responsibility and possibly incur liability for past management. (Jacquet 80)

When, on November 10, 1985, Ris told Jacquet that he had a "buyer" for URI, he was referring to John Catsimatidis. Catsimatidis and Ris had known each other for about one year after Ris had been appointed Chairman of the creditors committee and later trustee in bankruptcy of Capital Airlines in which Catsimatidis had a substantial ownership interest. (Catsimatidis 6) Discussions between Catsimatidis and Ris over a possible purchase of Capitol's stock and assets by Catsimatidis led to discussions of other similar investment opportunities. Catsimatidis specifically informed Ris and his associate, Michael Sherman, that he was available as an investor. (Catsimatidis 13)

High risk investments were a departure for Catsimatidis from his prior business activity. He is the President of Red Apple Supermarkets which runs supermarkets in the New York area, Red Apple Services

which is part owner of another company that charters corporate jets and Red Apple Real Estate which owns real estate in the tri-state area. (Catsimatidis 3, 4) Catsimatidis stated that he "was getting bored with the real estate business [and] looking to do something else." (Catsimatidas 34)

On the morning of November 15, 1985, the requested meeting arranged by Ris, took place in the New York office of Paribas with Jacquet, Catsimatidis, Ris and Antonio Dionisi, the senior credit officer of Paribas, in attendance. (Jacquet 84, 85; Catsimatidis 29, 33) Catsimatidis offered $2.5 million for the stock of URI and promised a written confirmation of the offer. (Catsimatidis 34, 35)

Jacquet found the $2.5 million to be below his expectations and stated conditions other than price that would have to be met before there could be an agreement, "to have the agreement of the other two shareholders, in case of an agreement to have immediate evidence of the funds, and to agree on the terms of the agreement, of the written agreement, mentioning specifically that we didn't want representations and warranties *inter alia*." (Jacquet 86, 87)

Catsimatidis testified that he agreed to do whatever Jacquet wanted him to do. (Catsimatidis 35, 37) In fact, that afternoon Catsimatidis filled out the papers necessary to open a Paribas bank account and signed a letter drafted by his attorney, Mr. Dykhouse. (Catsimatidis 36); (Jacquet, Aff.Ex. A).

The November 15, 1985 letter expressed the intent of UAC to "enter into an agreement (the "Agreement") pursuant to which the Banks shall sell and UAC shall purchase", the common stock of URI for a price of $2.5 million. The letter stated further, in pertinent part:

> UAC and the Banks shall immediately direct their respective attorneys to commence preparation of a mutually satisfactory form of Agreement, which shall, among other things, (i) provide for payment of the price in cash at closing against transfer to UAC of good title to the stock free of any liens, encumbrances, and security interests; (ii) require a closing not later than November 27, 1985 or a later date in the sole discretion of UAC; and (iii) [sic] warranties and conditions which are customary in transactions of this kind.

(Jacquet Aff. Ex. A).

The November 15, 1985 letter, although signed by Catsimatidis, was not executed by Paribas, and Jacquet telephoned Ris on November 27, 1985 to state that the offer was not accepted by the owners. (Jacquet 103)

Catsimatidis telephoned Ris at his home on Thanksgiving Day, November 28, 1985 and spoke with Jacquet who was spending the holiday with Ris and his wife. Catsimatidis remembered very little of this conversation at his deposition (Catsimatidis 58, 59), but in referring to the Thanksgiving conversation in his affidavit stated that "Jacquet indicated that he would prefer the offer to be increased." (Catsimatidis Aff. ¶ 7)

Catsimatidis considered increasing the offer and communicated this to Sherman, on December 2 and 3. (Catsimatidis 62). Ris then called Jacquet to inform him that Catsimatidis may be willing to increase the offer and Jacquet agreed to a meeting. (Ris 60; Jacquet 113).

Catsimatidis accompanied by Sherman met with Jacquet in Jacquet's office for about 15 minutes on Wednesday, December 4, 1985. (Catsimatidis 65, 66). Ris, who spent the day at URI's headquarters in Warren, Pennsylvania, did not attend. (Ris 126) At some point during this period, Catsimatidis communicated to Jacquet an offer of $2.5 million in cash plus $1 milion to be paid upon confirmation of the reorganization plan of the URC companies. Jacquet found this offer unacceptable. (Jacquet Aff. 5). At the December 4 meeting, Catsimatidis offered Jacquet $2.5 million cash plus $2 million upon the confirmation of the reorganization plan. Jacquet did not respond to the new offer at the meeting. (Jacquet 14; Catsimatidis 67)

Catsimatidis also stated that he was attempting to acquire another company and feared that his bank may impose certain restrictive covenants upon him that would impair his ability to continue his offer for the stock of URI. Nonetheless, Catsimatidis indicated to Jacquet that he was willing to go forward with the URI stock sale transaction, but would like to hear from him by noon Thursday December 5. (Catsimatidis 66, 67)

According to Catsimatidis, neither the timing of the agreement or the closing nor the necessity to wire funds were discussed. (Catsimatidis 67, 69, 70). When asked whether the discussion was strictly on price, Catsimatidis testified: "Cash deal, cash American money on the table, exchange of stock, usual representations and warranties." (Catsimatidis 67, 68). Catsimatidis was then asked whether there was any discussion about what the usual representations and warranties would include. He responded "I am sure it is whatever the SEC requires." (Catsimatidis 68) Catsimatidis also stated that he was willing to buy the shares of stock owned by Paribas if Jacquet had difficulty getting the other banks' approval. (Catsimatidis 72)

After the meeting Catsimatidis went with Sherman to his office and telephoned Dykhouse, but Dykhouse was not in. Because Catsimatidis felt he should send a written confirmation of the meeting, he borrowed Sherman's secretary and dictated a letter dated December 4, 1985. (Catsimatidis 70, 71) The letter referred to the letter of November 15 which was "amended" to reflect the discussions of December 4. There was no change in the requirement for the "preparation of a mutually satisfactory form of Agreement" referred to in the earlier letter. (Jacquet Aff. Ex. B).

Later in the day on December 4th, Ris called Jacquet. Jacquet told him that the new price proposed was not acceptable in light of an offer which had been hinted at by the creditors of URI and indicated that a $4 million offer would be more likely to get approval. (Jacquet 105) Following the meeting on December 4th, Catsimatidis also became aware that the URI creditors had made a substantial offer for the URI stock. (Catsimatidis 76) But he was told by Sherman or Ris that Jacquet had said "if Catsimatidis can come up with $4 million all cash, its his deal." (Catsimatidis 76, 82).

On December 5, 1981 Catsimatidis met Sherman and Ris for breakfast at the Plaza Hotel in New York. (Catsimatidis 87) According to Catsimatidis, Ris told him that Jacquet had said that if Catsimatidis arrives with $4 million it was his deal and Jacquet would not go back to the creditors. (Catsimatidis 91) Catsimatidis then told Ris and Sherman that he could come up with the money, but that he wanted to offer $3 million cash today and a million dollars over four months with interest. But he also informed them that "[i]f push comes to shove, I had to come up with $4 million today [sic], I will come up with it." (Catsimatidis 93)

Following breakfast with Sherman and Ris, Catsimatidis accompanied them to Ris's office where Ris called Jacquet to arrange a meeting. At 10:00 a.m. the meeting was held with the four, plus Dionisi and Aiello. According to Catsimatidis, Jacquet said "Look John, the deal. You need $4 million all cash and you got a deal." (Catsimatidis 100) Catsimatidis thereupon offered $3 million in cash with $1 million payable in four monthly installments of $250,000. (Catsimatidis 101) Jacquet did not accept the offer but asked for bank references. According to Catsimatidis, as the meeting was ending, Catsimatidis said he would try to come up with all cash "whether we do it three and one or four all cash." (Catsimatidis 102)

After the meeting, officials from Paribas began their credit inquiries. In the meantime, Catsimatidis who had gone to Chemical Bank decided to improve the offer and telephoned a $4 million cash offer to Ris. Later that day, Ris called Catsimatidis to tell him that "Michael [Jacquet] says $4 million all cash you got a deal, its a deal finished, complete." (Catsimatidis 105)

Ris testified that when he told Jacquet that Catsimatidis had $4 million and wanted to know if he had a deal (Ris 150), Jacquet replied "Yes, at $4 million." (Ris 150) Jacquet confirmed in his testimony that he agreed on the price but that "the only thing which was at stake at that moment was the price." We had always mentioned that the price was the first condition of the agreement. I said fine, or the equivalent in French. Effectively, I thought that $4 million was an acceptable price." (Jacquet 119).

Jacquet testified that Catsimatidis then called him and confirmed that he had $4 million in cash and Jacquet asked him to wire the funds but Catsimatidis said that at 4:00 p.m. it was too late to wire the funds. (Jacquet 22). Catsimatidis denies that the subject of wiring the funds was discussed, but says that he said to Jacquet "let's proceed and get it done as quickly as possible" to which the latter agreed. Thereupon, Catsimatidis called his attorney and told him "we have a deal, it's done, put the wheels in motion" and his attorney said "well, let me see if I can prepare a written agreement." Catsimatidis told him to "go forward and do whatever you have to do. I am prepared to finish the deal tonight, tomorrow morning, whatever." (Catsimatidis 105–107).

In the meantime, Dionisi prepared draft wiring instructions that did not specify an account. (PSM Ex. 5) Dionisi told Sherman that there was no deal yet since clearance had not been obtained from the Royal Bank. (Dionisi 54) That evening the attorneys for Paribas received from attorneys for Catsimatidis a nineteen page draft "Stock Purchase Agreement" containing twenty paragraphs of proposed "Representations and Warranties" by the Seller. (Jacquet Aff. Ex. 3) Catsimatidis recalls conversations with his attorney over the attorneys' negotiations on the representations and warranties and that "he said to me that there was a couple of things brought up that were never discussed before" and when asked whether these were indemnity terms, he replied: "It might have been yes. I said to him look—well

straighten it out whatever it is. I am going forward with the deal. I am doing the deal. It was a done deal. I was going forward with the deal." (Catsimatidis 111, 112)

On Friday, December 6, 1985, Catsimatidis says he received an early morning call from Sherman who said that Jacquet had cleared the deal with Paribas Suisse and to "be in their office at 10:00 o'clock in the morning and let's complete the deal." (Catsimatidis 110). Sherman confirmed that he made the call to relay Ris's report that Jacquet had scheduled "a closing" for 10:00 o'clock at Paribas. (Sherman 95).

Catsimatidis arrived at the Bank Paribas office at 10:00 a.m. Friday morning, where Sherman, Ris and Dykhouse were already waiting. (Catsimatidis 116) The four waited in the reception area for an hour and forty-five minutes. Catsimatidis 118) At 11:45 a.m., a secretary told them that it would be about 15 more minutes. (Catsimatidis 118) Later, at about noon, another secretary told them that they should go back to their respective offices and informed them that they would be contacted when the Paribas people were finished with their meeting. (Catsimatidis 118) The men then left the Paribas office and Catsimatidis went to Ris's office. (Catsimatidis 119) At 12:30 p.m. Catsimatidis was informed that Paribas was having trouble with the Royal Bank and that things should be straightened out by 3:00 p.m. (Catsimatidis 119)

In the meantime, Jacquet and his associates were in communication with Mr. Sell of Chase Manhattan Bank representing the Creditors Committee. Although Jacquet, Aiello and Dionisi deny that they told Sell about the Catsimatidis offer of $4 million or about the fact that Catsimatidis was in the reception room with a check, Dionisi and Aiello admit that during the negotiations Sell was aware of Catsimatidis offer and informed that the bank was waiting for the $4 million to come in from Catsimatidis. (Aiello 106; Dionisi 63)

Jacquet stated that he was at all times waiting for the funds to be wired in from Catsimatidis. In the afternoon of December 6, a Royal Bank official informed Jacquet that Royal Bank accepted the $4 million figure and that it agreed to proceeding with Catsimatidis. Jacquet then informed this official that Catsimatidis had not wired the funds and that the Creditors' Committee had made a better offer. (Jacquet 164)

Catsimatidis said that he knew of no requirement that the funds be wired and that he was ready, willing and able to wire the funds that morning, if necessary. Catsimatidis asserts that all anyone had to do was walk into the reception area where he had waited for two hours that morning and ask him to wire the funds and he would have wired "the money within five minutes." (Catsimatidis 122). Catsimatidis claims that he came to the meeting prepared to close the deal. He brought with him, however, a personal, not a certified check. (Ris 79; Warren Aff. Ex. C)

In any event, Jacquet received the increased offer from the Creditors' Committee, and at about 4:00 p.m. Sherman called Catsimatidis to tell him that there was no deal. (Sherman 100)

Later on Friday afternoon, Ris learned from Jacquet that Jacquet "had accepted the Creditors Committee offer after Catsimatidis didn't transfer the money" and that the Creditors' Committee offer was a better one. (Ris 78) Either that day or sometime over the weekend, Ris had a further telephone discussion with Jacquet in which Jacquet asserted that Catsimatidis broke the deal by not transferring the money, and Ris pointed out that it was "a breakdown in communication" because Catsimatidis had spent two hours waiting at Paribas, but had not been received by Jacquet. (Ris 81) During one of these conversations Jacquet told Ris that "we have given the creditors until 11:00 a.m. Monday morning [if that deal has] not been accepted by that moment, we shall be free again." (Jacquet 144) Ris relayed this information to Catsimatidis. (Ris 85)

On Monday morning at 11:00 a.m. Catsimatidis, Sherman, Ris and Dykhouse went to Jacquet's office to be told by Aiello that Paribas was "in the middle of the discussion with the Creditors' Committee. They are pleading for 15 or 20 minutes additional time." (Ris 86) Catsimatidis immediately tendered payment of a $4 million certified check to Aiello who immediately returned it saying "we will do the deal as soon as we get off the conference call." (Catsimatidis 132) Shortly before noon, Ris, taking the check with him, left the room for a moment to see Jacquet. (Catsimatidis 133) Jacquet told him that Paribas was examining a telex and claims that he never saw a check. (Jacquet 147, 156: Ris 88)

Finally, at 12:30 p.m. Catsimatidis approached Jacquet to state "Michel what's the story. We're here. We're ready to do the deal," to which Jacquet replied that "he was going to do the deal with the creditors." Catsimatidis requested a five minute discussion to try to change Jacquet's mind, but was unsuccessful in doing so. (Catsimatidis 134, 135)

Later that afternoon on December 9, 1985, UAC instituted the instant action and moved for a temporary restraining order to prevent the delivery of URI shares to the Creditors Committee. In its complaint, UAC alleges that the "negotiations with Ris and other representatives of the defendants ... culminated on December 5, 1985, in an agreement whereby the defendants agreed to sell and UAC agreed to buy all of the URI stock for $4,000,000 in cash" and that the defendants breached that oral agreement.

This court denied plaintiff's motion for a temporary restraining order and directed that prompt discovery take place. On December 13, 1985 the court held a trial on both the preliminary and permanent injunctions. At trial the court received in evidence the depositions of Catsimatidis, Jacquet, Aiello, Sherman, Ris and Dionisi, the affidavits of the parties, and documentary exhibits.

## The Standard for Injunctive Relief

"The standard in the Second circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Sandowsky v. City of New York*, 732 F.2d 312 (2d Cir.1984).

■ An irreparable injury is one that cannot be measured in damages. *Jackson Dairy* at 73. In the instant case, the plaintiff's inability to gain control of URI if the shares are sold to a third party constitutes an irreparable injury. *LTV Corp. v. Grumman Corp.*, 526 F.Supp. 106 (E.D.N.Y.1981). In *Grumman,* plaintiff sought a preliminary injunction enjoining the defendants from purchasing any shares of Grumman Corporation. The court found that the alleged plan for purchase of Grumman stock by the defendants would frustrate LTV's efforts to acquire more than 50% of the Grumman stock by tender offer and constituted irreparable harm.

Normally, in a case where specific performance would be appropriate, since the remedy at law is inadequate, a finding of irreparable harm in the denial of an injunction would also be appropriate. Thus specific performance cases bear upon the question of irreparable harm. Specific performance would be granted if plaintiff were successful on the merits based upon both the nature of the stock *Hunt Foods v. Doliner*, 49 Misc.2d 246, 267 N.Y.S.2d 364 (Sup.Ct.N.Y.), *rev'd on other grounds*, 26 A.D.2d 41, 270 N.Y.S.2d 937 (1st Dept.1966) (Fact that stock involved in the sales agreement was of an unavailable nature supported the grant of specific performance); *Baltimore Realty Corp. v. Alman*, 282 App.Div. 714, 122 N.Y.S.2d 224 (specific performance is available to enforce contracts for sale of closely held stock) and the fact that the purchase would vest corporate control in the plaintiff. *Feldman v. Brodsky*, 147 N.Y.S.2d 312 (Sup.Ct.N.Y.1955). (In buyer's action for specific performance of contract for sale of 84% of the outstanding shares of banking company's stock, temporary injunction granted restraining seller from disposing of the stock); *see also Beresovski v. Warszawski*, 28 N.Y.2d 419, 322 N.Y.S.2d 673, 271 N.E.2d 520 (1971) (specific performance only remedy where plaintiffs seek to enforce a shareholder's agreement requiring supermajority provisions which would directly effect the control of the corporation.)

Having found irreparable harm if the court should deny plaintiff's motion, the court now turns to the second branch of the test under Rule 65, specifically, either "(1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief" *Jackson Dairy, supra* at 72.

The plaintiff argues that it has made the appropriate showing by establishing that an oral contract to sell URI shares was created on December 5, 1985. Further, the plaintiff asserts that it can avoid the operation of the Statute of Frauds by invoking N.Y.U.C.C. § 8–319(d) (McKinney 1964 & Supp.1984) which states that an oral contract for the sale of securities may be enforced where "the party against whom enforcement is sought admits in his pleading, testimony or otherwise in open court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

For the reasons that follow, this court holds that the plaintiff has failed to make a showing going to the merits necessary to sustain an order for either a preliminary or permanent injunction. The plaintiff has not successfully demonstrated that the parties intended to be contractually bound by anything other than the final written agreement. Moreover, even if, contrary to the clear weight of the evidence at the hearing, the conduct of the parties on December 5, 1985 had resulted in an oral

agreement to sell the URI stock, that agreement is unenforceable under N.Y.U. C.C.Law § 8–319 for lack of either a writing or an admission by a party against whom enforcement is sought.

### A. The Existence of a Contract

The Second Circuit has held that under New York law "there are still situations where the absence of a signed, formal agreement is fatal to an argument that a contract exists." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984). The alternative New York rules on this subject were summarized in *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) and quoted in *Reprosystem:*

> First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informed agreement from taking effect prior to that event.... These rules, placing emphasis on intention rather than form, are sensible and reasonable.

727 F.2d at 261. Thus, the intention of the parties is paramount and "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (1984) (finding that parties had intended to be bound only by written contract, notwithstanding statement by defendant franchisors' representative over telephone to would-be franchisee that the parties had reached a "handshake agreement.") In *Reprosystem, B.V., supra,* the intent of the parties to have a signed written contract controlled even where extensive negotiations had been completed, no problems remained and final drafts had been prepared.

In *R.G. Group, supra,* the Second Circuit outlined four factors that "courts have looked to in deciding whether the parties'

words and deeds within a given bargaining context, show an intent to be bound only by a written agreement." 751 F.2d at 75. While no single factor is decisive, each provides significant guidance. The four factors are: (1) whether a party has explicitly stated "that it reserves the right to be bound only when a written agreement is signed." (2) "whether one party has partially performed, and that performance has been accepted by the party disclaiming the contract"; (3) "whether there is literally nothing left to negotiate or settle so that all that remained to be done was to sign what had already been fully agreed to"; and (4) "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *Id.* at 75, 76.

■ In the present case, the evidence on each of these factors supports the defendant's position. To begin with, Catsimatidis' own actions following what he claims was a binding agreement on December 5, 1985 demonstrate that he did not intend to be bound by anything other than a written agreement. After learning from Ris that there was a "deal" at $4 million cash, he instructed his attorney on December 5 to prepare a written agreement which was drafted that evening. That evening, when he was informed about difficulties in the negotiations concerning representations and warranties running in his favor, he did not instruct his attorney to stop negotiating the additional terms since they already had a contract. Instead, Catsimatidis instructed his attorney to "straighten it out." Indeed he had continuously expressed a need for a written contract from the onset of the negotiations. In his letter dated November 15, 1985, confirming his offer of $2,500,000 for the URI stock, Catsimatidis states that the parties shall "direct their respective attorneys to commence preparation of a mutually satisfactory form of Agreement ..." On December 4, 1985, Catsimatidis personally drafted, signed and sent another letter confirming his new offer and expressly incorporating the terms

of the November 15, 1985 letter, except as amended, including the term requiring a written agreement. There is no language in the draft agreement prepared by Catsimatidis' attorneys to indicate that it was drafted pursuant to an oral agreement or that there was any intent other than that the writing be the definitive agreement. Indeed the draft expressly states that: "This Agreement has been duly executed and delivered by the Seller and each of the Banks and constitutes the legal, valid and binding obligation of each such party, enforceable in accordance with its terms." (Jacquet Aff. Ex. C).

There is no partial performance upon which plaintiff relies. Catsimatidis states that he was prepared to perform on Friday, December 6 and he did, in fact, offer a certified check to Paribas officials on Monday, December 9. These officials, however, never accepted the check. Only when a party accepts performance does it signal that the parties understand that a contract is in effect. *R.G. Group, supra*, 751 F.2d at 76.

The oral agreement on December 5 as to the price of the deal left much to negotiate. Plaintiff proposed a Stock Purchase Agreement with numerous representations and warranties that had not been the subject of any discussions during the previous negotiations between the parties. These provisions were not merely formalistic clauses in a written agreement; they involved substantial matters to be negotiated or settled.

Some of the representations and warranties that UAC insisted upon were: (1) that the audited financial statements of URI for fiscal years ended August 31, 1984 and the unaudited financial statements of URI for the fiscal year ended August 31, 1985 and for the month ended September 30, 1985 are complete and correct and have been prepared in accordance with generally accepted accounting principles consistently applied; (2) that since September 30, 1985 neither URI nor its subsidiaries had issued any securities, borrowed or incurred liabilities other than current liabilities, mortgaged any property, sold any trademarks, patents, trade secrets, etc., made any changes in employee compensation, suffered any casualty that was not fully covered by insurance; (3) that URI or its subsidiaries had good and valid title to each of the properties and assets reflected on the balance sheet as of September 30, 1985; (4) that URI has filed all federal and state tax returns required to be filed for all tax years prior to August 31, 1985; (5) that neither URI nor any subsidiary is a party to any agreement adversely affecting to any material extent the business, properties or assets, operations or conditions of URI or any such subsidiary; (6) that neither URI nor any subsidiary has any employment contracts in force or is obligated to participate in or contribute to any multi-employer retirement plan; (7) that URI is not a party to any contract or commitment involving more than $25,000 or having a term of more than one year except as set forth in a Disclosure Statement dated March 6, 1985; (8) that URI and its subsidiaries are in compliance with federal and state and local laws, ordinances and governmental regulations; and (9) that URI is in compliance with ERISA.

From these requested provisions, it is clear that UAC was concerned not only over whether URI had good title to the assets referred to on its balance sheets but also whether URI had incurred any substantial liabilities or encumbrances. UAC had good reason to include such warranty provisions. URI's latest financial statements were unaudited, it was involved in bankruptcy proceedings, and it had only recently been purchased by the defendants. The provisions, however, would thrust a potentially substantial liability upon the banks. Whether the risk of this liability was to be borne by UAC or the defendants was not only subject to negotiations after the December 5, 1985 agreement on the price term, but was actually being negotiated that evening by the attorneys. Further negotiations were held over the banks' insistence on an indemnification.

The fourth factor in *R.G. Group, supra* is whether the agreement concerns those

complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception. The sale of all of the stock and transfer of control of a business normally requires a writing precisely because numerous representations and warranties usually have to be negotiated to allocate the risk of losses between the buyer and seller. Catsimatidis recognized this in his November 15 letter. The drafting of the Stock Purchase Agreement by Catsimatidis' attorney was consistent with this norm.

Moreover, evidence of this practice is found from the fact that both parties acted in a manner fully consistent with a requirement of a writing up until the time that it was apparent that there would be no deal. As mentioned above, Catsimatidis insisted in his original offer of November 15, 1985 and again on December 4, 1985 that the parties should direct their respective attorneys to prepare a mutually satisfactory form of Agreement and, following the December 5, 1985 oral agreement as to the price of the stock, Catsimatidis instructed his attorney to draft a written agreement. Jacquet testified that one condition of the contract was that there be a written agreement. Consistent with Jacquet's testimony is the fact that before negotiations began with Catsimatidis, Jacquet has reached an oral agreement as to price with another potential buyer of URI stock, Guinan. When Guinan walked away from the deal prior to a writing, there was not a hint that Jacquet could have enforced the agreement. Finally, a further indication that writings are usual in stock purchases is that, as will be discussed *infra*, such transactions are governed by the Statute of Frauds, N.Y.U.C.C. § 8–319, which as a general matter requires a writing for a sale of securities.

Plaintiff's argument that defendants' conditions of sale other than the price, namely, approval by the Royal Bank and wiring of the funds to Paribas were a "sham" and, in any event, were fulfilled by the Royal Bank's acceptance of the price term on December 6 and by Catsimatidis' willingness to tender payment coupled with defendants' failure to designate an account for wiring the funds begs the core question. That question is: did the parties intend to be bound by an oral agreement or by the execution of a written agreement? This court finds it was the latter.

This court finds the evidence to be clear, indeed overwhelming, that the "deal" reached orally on December 5 was only as to the price of the transaction for the sale of the company and that both parties fully expected there to be executed a written agreement embodying not only that term, but also the outcome of subsequent negotiations as to the representations and warranties sought by the buyer and the release and indemnification sought by the seller. Such an agreement was first contemplated in the plaintiff's letter of November 15, 1985, was manifested in the draft Stock Purchase Agreement that plaintiff requested his attorneys to prepare on December 5 after the price term had been agreed upon and was the subject of negotiations that evening. In sum, contrary to plaintiff's contention, the parties failed to form an oral contract on December 5, 1985.

Accordingly, this Court holds that plaintiff has failed to sustain its burden of showing either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation.

### B. *Statute of Frauds*

Even if this court were to hold that the parties did not intend to be contractually bound only by the written agreement and that the oral "deal" to sell the stock of URI for $4 million cash created a contract, the plaintiff would have to show that the New York Statute of Frauds governing securities transactions would not prevent enforcement. That statute, N.Y.U.C.C.Law § 8–319 (McKinney 1964 & Supp.1984), states in pertinent part:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

.    .    .    .    .

(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

The plaintiff has pointed to no writing "signed by the party against whom enforcement is sought or by his authorized agent or broker" referring in any way to the "oral contract" between plaintiff and defendants much less one that references a contract "for sale of a stated quantity of described securities at a stated price" as would satisfy § 8–319(a). Rather plaintiff argues that the contract is enforceable under § 8–319(d) because Ris, acting as agent for defendants, admitted at his deposition received in evidence at trial that there was a contract. Specifically, plaintiff points to the following testimony of Ris:

> "Q Okay. We are back to this four million cash later on in the afternoon on December 4th?
>
> A Yes.
>
> Q You relayed this back?
>
> A I called Mr. Jacquet and I said, "Michel, Mr. Catsimitidis is at the bank with an officer of the bank and he would like to know if he has a deal."
>
> Michel said, "Yes."
>
> Q He said "Yes"?
>
> A Yes.
>
> Then I hung up and called back Catsimatidis and I said, "I talked to Michel and he said you have a deal."
>
> Q What did Catsimatidis say to you?
>
> A Nothing else."

(Ris 63, 64)

■ Plaintiff's argument fails on several grounds. Whether or not Ris acted as an agent for defendants in securing a buyer for the URI stock—a point in dispute, he was not acting as defendants' agent at the time of the "oral contract" or at any time during the negotiations with Catsimatidis. Moreover, even if he had been their agent then, there is no showing that he was an agent or in any way authorized to bind defendants at his deposition.

Ris was recruited by Jacquet to become the President and C.E.O. of the bankrupt URI. The URI Board of Directors, consisting of its former chairman and representatives of the defendants, approved Ris for this position "on an interim basis" at a salary of $60,000 per month to protect the assets of the Company, evaluate its management, keep the board fully supplied with financial and operating information and to negotiate on the Board's behalf with the creditors group. At the same time, the Board recognized the need for "the timely sale of the company for the highest reasonable price" but nowhere did it assign the task of selling the company to Ris. (PSM Ex. 1). Jacquet denied that Ris had any "mandate" to find a buyer for URI stock: "It was not part of his duties." However, it was common knowledge that a purchaser was being sought and Jacquet told this to Ris. (Jacquet 83, 84). Ris maintains that he was requested by Jacquet to find a buyer, if not in so many words, in "substance," and that he met with several potential buyers thereafter (Ris 45–52). Of course, it was Ris who found Catsimatidis.

■ Even if, on the foregoing evidence, Ris could be held to be the agent of Paribas for the purpose of finding a buyer of URI stock, it is clear that any such agency did not encompass negotiating the sale once a buyer was found. Ris testified:

> I was never a negotiator. This has to be very clear. My role was very clear on that. I would take a message. Maybe within the half-hour or of the hour or of the day, I would report to Mr. Jacquet and said, "This is what you have. This is what he is willing to do." I would wait for him to make a decision. (Ris 55)

The role of Ris, not as a negotiator but as a message transmitter, is borne out by the testimony of every witness to the negotiations. This is particularly clear from the plaintiff's own testimony. When a question arose at the deposition over who had the authority to accept an offer to buy the URI shares at $3 million or $4 million, Catsimitidis cleared it up.

Q. You said he (Ris) had authority to take the $3 million or $4 million?

A. No, Mr. Jacquet had the authority. (Catsimatidis 18).

Catsimatidis testified that he told Jacquet that he could be reached during the negotiations either directly or through Ris, indicating that Ris was on his side of the negotiations. (Catsimatidis 48). Particularly telling on this point is the testimony of Catsimatidis that at a breakfast meeting on December 5th with Ris and Sherman he outlined his strategy for the forthcoming negotiations with Paribas.

I am willing to accept the $4 million number but let's see if we can get it stretched out a little bit and give him $3 million cash today and maybe a million dollars over four months with interest and everything and I will personally guarantee it. If push comes to shove, I had to come up with $4 million today, I will come up with it. (Catsimatidis 93)

This event belies any claim that Ris was an agent of Paribas in the negotiations. If anything, Ris appears to have been an honest messenger. This is borne out by Ris's transmittal of Jacquet's acceptance of the price term offer of Catsimatidis of $4 million cash.

█ Finally, there is no showing that Ris was the agent of Paribas or the other defendants at his own deposition with authority to bind them by an admission. He had been retained by the Board of Directors of URI at a handsome salary to manage that company and was clearly available to Paribas for consulting services. Ris at most simply volunteered to locate a potential buyer and then acted as a go-between, relaying messages. He was not an employee of Paribas. He had no authority to negotiate on its behalf, and, similarly he had no authority to bind the Bank at his deposition. In such circumstances, he cannot be deemed a "party" for purposes of Section 8–319(d), which provides that a party's sworn, in-court statement may substitute for the party's signature. It would be anomolous to hold that a person who could not bind the Bank by negotiating or signing the contract could bind it by testifying to a contract. Such a holding would be inconsistent with the purpose of a statute of frauds, which is to avoid just the sort of problems that have arisen here where plaintiff testifies as to an oral agreement not evidenced in writing or fully admitted to by the party to be charged.

In any event, even assuming *arguendo* Ris to be a "party," there has been no statement by Ris that could be construed as an admission that there was a binding contract within the requirements of § 8–319(d). A statement in the judicial proceeding must be clear and unequivocal to be an admission within the meaning of § 8–319(d). *Gruen Industries, Inc. v. Billen*, 608 F.2d 274 (7th Cir.1979) (vague statements are insufficient to establish an admission).

█ In addition to the deposition testimony cited by the plaintiff, Ris stated that he believed any agreement between UAC and the defendants would have to be reduced to a writing to be executed by the parties. Thus, after testifying that the Bank accepted the "deal", Ris said he spoke to plaintiff's principal, John Catsimatidis:

Q: What were those discussions?

Ris: The discussion was a very simple one. I told him that we should now start to have all the lawyers starting to work on the papers so there should be no delay there.

And Mr. Catsimatidis said "Yes, I agree." (Ris 64–65).

Far from being clear and unequivocal statements of the existence of an oral contract, Ris' words indicate his belief that the parties intended to enter into a formal writ-

ten contract before there would be any binding agreement.

Ris testified that Paribas found the draft written agreement prepared by Catsimatidis' counsel (Jacquet Aff. Ex. C) to be unacceptable. Ris testified that he told Jacquet that the Bank's problems with that written contract could be worked out. When asked what would happen if those problems could *not* be worked out, Ris testified: "There would be no deal" (Ris 133). Such testimony simply cannot be squared with plaintiff's claim that Ris testified that there was a contract within the meaning of Section 8–319(d).

Short shrift may be made of plaintiff's argument that the testimony of Dionisi and Jacquet, taken together satisfies the requirement of § 8–319(d). Plaintiff concedes in its brief that "none of the Paribas executives individually admit the existence of a binding contract", but argues that the court may find such an admission by aggregating facts admitted separately in their depositions. Apart from whether such an aggregation may satisfy the requirement of § 8–319(d) as a matter of law, in this case it does not constitute the required admission in fact.

Dionisi's testimony went further than stating that there was a deal "subject only to the concurrence of the Royal Bank of Canada"; he stated that the deal was also "subject to the usual documentation and terms", in other words a written contract (Dionisi 57) and that the "deal" of $4 million in cash was only "in terms of the price." (Dionisi 47, 48) Similarly, Jacquet's testimony was more than that the deal was subject to the wiring of the funds which never arrived. Such a transmittal would not have completed the contract since, as Jacquet testified the contract was subject to "an acceptable writing of the agreement." (Jacquet 106) Thus, it is clear from the testimony of both officers that neither viewed any "deal" as binding until a written contract was signed. (Dionisi 57, Jacquet 106) Accordingly, the requisites of § 8–319(d) are not satisfied by the testimony of the Paribas bank officers.

*Conclusion*

Since the evidence clearly shows that the parties did not intend to be contractually bound until the execution of a written agreement to purchase URI stock and that there was no admission by a party against whom enforcement is sought, or its agent, of the existence of an oral contract such as would satisfy N.Y.U.C.C. § 8–319(d), the court holds that plaintiff, while making out a case for irreparable harm, has failed to establish the requisites going to the merits for the preliminary injunction requested. The preliminary and permanent injunction having been consolidated for trial pursuant to Rule 65(a)(2), the court denies the motion for a preliminary injunction and enters judgment for the defendants on the permanent injunction.

So Ordered.