R.G. GROUP, INC., and R.G.
Restaurant Associates,
Plaintiffs-Appellants,

v.

The HORN & HARDART COMPANY,
and Bojangles' of America, Inc.,
Defendants-Appellees.

No. 48, Docket 84–7342.

United States Court of Appeals,
Second Circuit.

Argued Sept. 20, 1984.

Decided Dec. 11, 1984.

Jared Specthrie, New York City (Milberg Weiss Bershad Specthrie & Lerach, New York City, of counsel), for defendants-appellees.

Arthur S. Olick, New York City (Anderson, Russell, Kill & Olick, P.C., New York City, of counsel), for plaintiffs-appellants.

Before LUMBARD, OAKES and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Plaintiffs R.G. Group, Inc. and R.G. Restaurant Associates appeal from a judgment of the United States District Court for the Southern District of New York, Mary Johnson Lowe, *Judge*, granting defendants' motions for summary judgment in an action based on breach of contract and promissory estoppel. Plaintiffs claim to have made an oral agreement with the defendants, Bojangles' of America, Inc., and its parent corporation, The Horn & Hardart Company, in which plaintiffs gained the exclusive right to develop and operate some twenty "Bojangles' Famous Chicken 'N Biscuits" fast-service restaurants in the southern half of Houston, Texas. Defendants deny that such an agreement was ever concluded. In granting summary judgment for defendants, the district court determined that the parties had intended to be bound only by a written contract, and that no written contract was ever executed; that the alleged

oral agreement was, in any event, subject to the statute of frauds, and that the statute of frauds was not satisfied by the writings put forward by the plaintiffs; and that there was nothing to support a claim based on promissory estoppel. We affirm.

Under our law of contracts parties are free, within certain limits, to set the conditions under which their agreements will become binding. Sometimes an oral promise or handshake is all that is needed, but when substantial sums of money are at stake it is neither unreasonable nor unusual for parties to require that their contract be entirely in writing and signed before binding obligations will attach. In the present case the parties set exactly that requirement, and they did so in such a forthright, plain manner that there is no issue left to be tried. The case does not even present much of a cautionary tale: its lesson is simply that when experienced businessmen and lawyers are told explicitly and clearly that a major and complex agreement will be binding only when put in writing, then they should be rather cautious about assuming anything different.

## I. BACKGROUND

Defendant Bojangles' of America, Inc. ("Bojangles'"), a subsidiary of The Horn & Hardart Company ("Horn & Hardart"), owns or franchises approximately 141 fast-service restaurants. A franchisee has the right to use the trademarks "Bojangles'" and "Bojangles' Famous Chicken 'N Biscuits", and becomes part of a system of restaurants using standardized designs, color schemes, menus, cooking and operating procedures. A Bojangles' development franchisee develops and owns anywhere from five to twenty Bojangles' restaurants, each of which operates under a twenty-year license.

In late May or early June of 1982 the president of Bojangles', Jack Z. Fulk, Sr., met with Richard Gillman to discuss Gillman's interest in obtaining a Bojangles' development franchise. Since the initial discussion and follow-up contacts appeared promising, Gillman formed a limited partnership, R.G. Restaurant Associates ("RG Associates"), in the expectation that it would become a development franchisee, and a corporation, R.G. Group, Inc. ("RG Group"), to serve as its general partner. Gillman is the president and chief executive officer of RG Group.

Either at the first meeting with Gillman or immediately thereafter, Bojangles' gave Gillman a copy of its standard form development franchise agreement and advised him that only slight modifications in it could be made. That form is a twenty-page, single spaced document containing complex provisions. Its second sentence states "This is your Development Franchise Agreement; when duly executed it sets forth your rights and your obligations to BOJANGLES' and BOJANGLES' rights and obligations to you". Its general provisions include requirements that the entire agreement, and any modifications, be in writing and signed by the parties:

> This Development Franchise Agreement together with all the Appendices and exhibits annexed hereto contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior negotiations and oral understandings between the parties hereto, if any. There are no agreements, representations, or warranties other than those set forth, provided for or referred to herein.
>
> \*   \*   \*   \*   \*   \*
>
> Neither this Development Franchise Agreement nor any provisions hereof may be modified, waived, discharged or terminated, in whole or in part, except by a writing signed by the parties hereto \* \* \*.

This standard form agreement has blank spaces where the parties must fill in certain key provisions, including the development schedule specifying the time in which a franchisee would be required to develop the franchise area, and a description of the area itself. The importance of the development schedule is emphasized by the fact that, under the standard agreement, failure

to meet the schedule would be a ground for default.

Although Gillman hoped to have the standard form agreement modified in various ways, execution of that agreement was still seen as essential at the time when partnership units in RG Associates were offered. The private placement memorandum for RG Associates, dated September 10, 1982, states:

> In the ordinary course of its business (subsequent to the execution of the Development Franchise Agreement), the Partnership shall on an exclusive basis develop, own and operate the number of "Bojangles' Famous Chicken 'N Biscuits" restaurants for the term and within the Houston, Texas, area. The exact geographic limits of the market area are subject to final agreement with Bojangles' of America, Inc., and will be set forth in the Development Franchise Agreement to be executed by the General Partner on behalf of the Partnership.

The exact territory to be developed was a matter of ongoing discussion. In a letter dated September 30, 1982, Bojangles' franchise development director, Ronald Basinger, sent RG Group a proposal for the Houston, Texas area, explaining that "we are basically talking about the Harris County area as representing the territory; however, there is such tremendous growth to the southwest that we would also include in Mr. Gillman's territory the Fort Bend County area." Basinger enclosed what he called "a rough copy of our proposed breakdown for the [territory]." The "rough copy" was a map with two heavy lines drawn on it indicating inner boundaries between three areas of Houston, but not indicating any outer boundaries. The letter closed by asking, "Once you have received this information, please contact me at your convenience and we will review this data."

The record does not indicate whether RG Group responded to this proposal, but in an October 19, 1982, letter Basinger again wrote to RG Group about the "proposed area", referring to it as "the southern half of Harris County" and saying that "we would also give [Gillman] the rights to Fort Bend." Basinger wrote that "it is imperative that we all get together and finalize this territory in order that we may begin our development in the Houston area."

On November 30, 1982, John McNeill, one of RG Group's attorneys, wrote to Bojangles' attorney "confirming in writing the areas of agreement, as well as those items still open for discussion which, hopefully, will be resolved". Still unresolved were the exact territory boundaries and the development schedule. The letter states that "a finalization of both the development schedule and the territory designations" would be taken up at a future meeting with Bojangles' president. The McNeill letter closed by saying,

> We hope to be meeting with Mr. Schupak [attorney for Bojangles' and Horn & Hardart] and yourself as soon as possible to resolve all outstanding issues and to reduce our agreement to writing.

On December 2, 1982, Ronald Winarick, the chief operating officer of RG Associates, met with Bojangles' president, Jack Fulk, in an attempt to reach agreement. Winarick testified on deposition:

Q. Was the deal closed on December 2nd?

A. No, it was not.

Q. Were there issues that remained outstanding?

A. Yes, there were.

Q. What issues remained outstanding?

A. Most favored nations clause, franchise fee, there might have been— yes, those are the major—territory. And territory.

Q. The territory?

A. The boundaries, final boundaries.

Q. The boundaries of the territories determined where the individual stores would be, is that correct?

A. Not the exact locations. The boundaries are the square miles, total square miles.

Q. So at the conclusion of that meeting on December 2nd, there was still no agreement as to the scope of the boundaries, is that correct?

A. Not between myself and them, no.

Winarick agreed that the specification of the territory was "an important term of the agreement".

The next day, December 3rd, Winarick telephoned Fulk. Winarick's deposition testimony was the following:

Q. Why did you telephone him?

A. I wanted to discuss with him once more those points.

Q. Were you still attempting to get his agreement on those points?

A. Yes, I was.

Q. Did you get his agreement on those points?

A. No, I did not.

Q. I'm sorry. Maybe I didn't hear your answer. Was it one telephone conversation or two that you had with Mr. Fulk following that meeting of December 2nd?

A. I think it was two.

Q. Can you separate those telephone conversations in your mind?

A. No.

Q. Can you tell me as best you can recall what was said by Mr. Fulk, what he said to you and what you said to him during those conversations?

A. Definitely. I told him that—I asked him—we went through the letter again, I should say—if he would give me something, concede and agree on some of those—some or one or many of those points. We felt that we could—if given one or two we could just close—close this thing.

Q. Did he concede?

A. No, he did not.

Q. How did the telephone conversation end?

A. He said he hoped that we would—he would like to have us as a franchisee, he thought we were the right kind of people, but he did not want to jeopardize his system.

Q. Did you understand that his approval was necessary to become a franchisee?

*     *     *     *     *     *

Q. Did Mr. Fulk indicate to you that his approval was necessary?

A. No, he didn't make that statement that he must agree.

Q. Did he indicate to you that he would not agree to these disputed items no matter what anyone else with whom you were negotiating agreed?

A. Yes.

Later that day Winarick told Gillman that Fulk had said the agreement should be "worked out" between Gillman and Donald Schupak, Bojangles' attorney. Gillman then telephoned Schupak and, as Gillman claims in an affidavit, agreed to Bojangles' position "on all disputed points". He states that "Schupak and I reached a meeting of the minds on all the material terms of the contract". He did not discuss with Schupak the territorial boundaries or the development schedule because he believed that "these items had already been agreed upon between Winarick and Fulk." In his deposition Gillman testified that he had asked Schupak over the telephone, "Do we have a handshake deal?" Schupak's answer, according to Gillman, was "Yes, we have a handshake deal today and right now".

Schupak dictated a memorandum of this conversation with Gillman, which reads in part:

I had a lengthy telephone conversation with Dick Gilman [sic] the morning of December 3rd the conclusion of which we made a telephone "handshake" deal and agreed that a letter of understanding incorporating the points that we agreed upon would be completed by Eric [Bojangles' attorney] as early as possible during the week and that Dick [Richard Gillman] would sign the franchise development agreement and pay the franchise

deposit fee of $5,000 for each store to be developed upon execution.

\* \* \* \* \* \*

I suggest that Eric prepare language as promptly as possible and submit a copy for review by Jack Fulk and myself as early in the week as possible. Once a final letter has been agreed upon I suggest that it be transmitted to McPhearson [sic; RG Group's attorney] with a cover letter from Eric stating that the letter represents the understanding reached between Dick Gilman [sic] and myself and show a copy of the letter and enclosure to both me and to Gilman [sic].

\* \* \* \* \* \*

I told Gilman [sic] I saw no inherent reason of why we would not consider accepting one of his limited partners as a development franchise for another area and suggested that the limited partner contact Jack Fulk as soon after Gilman's [sic] franchise agreement was executed as he chose.

\* \* \* \* \* \*

Once the development franchise agreement is signed, I think it would be a worthwhile investment in brotherhood to show some particular kind attention to Winerick [sic] and perhaps to Gilman [sic].

The agreement, however, was never signed. On December 14, 1982, Schupak called Gillman and told him that Bojangles' franchise committee had refused to approve the application put together by Gillman. In early 1983 RG Group and RG Associates began this suit, seeking, initially, a temporary restraining order and preliminary injunction to restrain Bojangles' from franchising third parties to develop restaurants in the Houston, Texas, area. The district court denied this relief, and, after the parties completed discovery, it granted summary judgment to Bojangles' and Horn & Hardart.

## II. Discussion

### A. *Was there a Contract?*

■ Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y. S.2d 841, 843, 260 N.E.2d 493, 494 (1970). This rule holds even if the parties have orally agreed upon all the terms of the proposed contract. *Schwartz v. Greenberg,* 304 N.Y. 250, 107 N.E.2d 65 (1952). On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and "[w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement," then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain "complete immunity from all obligation" until a written agreement is executed. 1 A. Corbin, *Corbin on Contracts* § 30, at 98 (1963). What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances. *See ABC Trading Co. v. Westinghouse Electric Supply Co.,* 382 F.Supp. 600, 602 (E.D.N.Y.1974); *Church of God of Prospect Plaza v. Fourth Church of Christ, Scientist, of Brooklyn,* 76 A.D.2d 712, 431 N.Y.S.2d 834, 837 (1980), *aff'd,* 54 N.Y.2d 742, 442 N.Y.S.2d 986, 426 N.E.2d 480 (1981); 1 A. Corbin, *supra,* § 30, at 107.

■ It is important to commerce that the law make clear what force will be given to various expressions of intent, for otherwise parties could never be assured that they were, in fact, channeling their negotiations toward an oral contract or toward a written

one. Hard and fast requirements of form are out of place, of course. *See, e.g., Washington Heights-West Harlem-Inwood Mental Health Council, Inc. v. District 1199*, 748 F.2d 105 (2d Cir.1984). But when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.

Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception. *See International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 57–58 (2d Cir.1979) (Friendly, *J.*, concurring).

These general concerns are reflected in the list of factors courts have looked to in deciding whether the parties' words and deeds, within a given bargaining context, show an intent to be bound only by a written agreement. No single factor is decisive, but each provides significant guidance. *See generally Mississippi & Dominion Steamship Co. v. Swift*, 86 Me. 248, 29 A. 1063, 1067 (1894) (suggesting factors to be considered), *quoted with approval in Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958).

To begin with, it is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement. Just recently, in *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), we decided that a mutual intent not to be bound prior to execution of formal documents was "conclusively establish[ed]" when neither party took exception, over the course of bargaining, to provisions in the drafts of the proposed contracts which stated that *"when executed and delivered, this * * * Agreement and each of the Purchase Agreements will be a valid and binding agreement"* (emphasis added). In *ABC Trading Co. v. Westinghouse Electric Supply Co.*, 382 F.Supp. 600, 602 (E.D.N.Y. 1974), the court rejected an alleged oral agreement because an earlier letter from one of the parties, written three and one-half months before the alleged agreement, had said, "If your client finds this proposal agreeable in principle, we can proceed to reduce it to a written agreement * * *" (footnote omitted). *See also Chromalloy American Corp. v. Universal Housing Systems of America, Inc.*, 495 F.Supp. 544, 550 (S.D.N.Y.1980) (finding no oral contract under New York law when "correspondence between the parties not only refers to a written agreement, but expressly disclaims any intention to be bound until the execution of such a document"), *aff'd mem.*, 697 F.2d 289 (2d Cir.1982); *Ashton v. Chrysler Corp.*, 261 f.Supp. 1009 (E.D.N.Y.1965) (finding no contract for dealership franchise when application said that agreement must be signed, and there was no signed agreement); *Church of God of Prospect Plaza v. Fourth Church of Christ, Scientist, of Brooklyn*, 76 A.D.2d 712, 431 N.Y.S.2d 834, 837 (1980), *aff'd.*, 54 N.Y.2d 742, 442 N.Y.S.2d 986, 426 N.E.2d 480 (1981) (finding a contract although no document was signed, since there was no express or implied reservation that agreement would only be effective when signed).

A second factor of major significance is whether one party has partially performed, and that performance has been accepted by the party disclaiming the contract. Aside from unilateral contracts, partial performance is an unmistakable signal that one

party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect. It was exactly this factor of partial performance and acceptance which was decisive in *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), where we found that an oral contract had been made. *See also Viacom International Inc. v. Tandem Productions, Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974) (performance for a year "is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument"), *aff'd*, 526 F.2d 593 (2d Cir.1975); 1 A. Corbin, *supra*, § 30, at 107–09; 1. S. Williston, *A Treatise on the Law of Contracts* § 28A, at 74–75 (3d ed. 1959).

A third factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to. *See Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 390 N.E.2d 1143 (1979) (finding a contract although document was not signed, since signing was authorized and was purely ministerial); *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958).

A fourth factor is whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–63 (2d Cir.1984); *International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 57–58 (2d Cir.1979) (Friendly, *J.*, concurring); 1 A. Corbin, *supra*, § 30, at 105–06.

■ In the present case the evidence on each of these factors unequivocally supports Bojangles' position. There was, first of all, the explicit wording of the development franchise agreement itself, which declared on its face that "when duly executed" it would set forth the parties' rights and obligations, that there were no other agreements between the parties, and that any modification in the agreement would also have to be in writing and signed. This was Bojangles' initial offer and by common consent the basis for all future bargaining. There never was a written modification of the requirement that the contract be in writing. On the contrary, plaintiffs' private placement memorandum stated that the partnership was being formed subject to the execution of the development franchise agreement, and the McNeill letter referred to negotiations designed to resolve outstanding issues and "to reduce our agreement to writing."

The sole expression which might, in a different context, have indicated some doubt about the writing requirement was Schupak's statement over the telephone on December 3rd that the parties had a handshake agreement. Yet even that statement made no explicit reference to a waiver of the requirement that the contract be in writing, and it occurred at the end of months of bargaining where there were repeated references to the need for a written and signed document, and where neither party had ever, as far as the record before us shows, even discussed dropping the writing requirement.

The second factor towards which courts have looked is the acceptance of partial performance. In *V'Soske* we found an oral agreement because there were mutual partial performance following the agreement; but here there was no performance, partial or otherwise, by either party.

The third factor—whether there was literally nothing left to agree to—supports defendants' position as well. Winarick, RG Associates' chief operating officer, admitted in a deposition that the territory issue was an important one. According to Gillman nothing was said in the December 3rd telephone conversation about the exact franchise territory; he believed that the matter had been settled earlier. But Gillman was mistaken about this, a fact that confirms the wisdom of having a writing requirement in deals of this kind. He was

mistaken because Winarick testified that the territory question was still open on December 2nd, and that he still did not get agreement on this in his own December 3rd telephone call to Bojangles' president.

The fourth factor concerns the extent to which, as a practical business matter, the agreement involved a scale of investment and complexity such that a writing requirement would be expected. Certainly this is the kind of agreement where it would be unusual to rely on an oral understanding. Bojangles' franchise contracts run for twenty years and cover detailed matters of capital structure for franchisees, purchase and development of real estate, construction of stores, trade secrets, transfers of interest, and rights on termination or default. Perhaps most telling is the fact that the parties were talking about an initial investment of some two million dollars, and that the plaintiffs' complaint alleges lost income, profits, and injuries of "at least" eighty million dollars. With that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone.

■ With the evidence on these factors so overwhelmingly in favor of one position, and since pretrial discovery provided nothing to contradict that evidence, there is no question but that the district court acted properly in granting summary judgment for the defendants. Summary judgment is called for when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion the court "cannot *try* issues of fact, but can only determine whether there *are* issues of fact to be tried." *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 (2d Cir.1962) (emphasis in original); *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976). While doubts must be resolved in favor of the party opposing the motion, the opposing party must provide "concrete particulars" showing that a trial is needed, and "[i]t is

not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to that motion." *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978). If after pretrial discovery the court is "convinced as a matter of law that the suit can have only one possible outcome", summary judgment must be granted. *Reliance Insurance Company v. Barron's*, 442 F.Supp. 1341, 1343–44 (S.D.N.Y.1977). Since the present case is one in which it was convincingly demonstrated that the suit could have only one outcome, we hold that the district court made no error in finding that no oral contract had been made.

B. *The Statute of Frauds.*

■ The district court did not rest its decision solely on the question of the parties' intent; it also decided that even if there had been an oral agreement, it would be rendered void by New York's statute of frauds. That statute provides in relevant part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof * * *.

N.Y.Gen.Oblig.Law § 5–701(a) (McKinney 1978 & Supp.1983–1984). The required memorandum may consist of several documents only some of which are signed, provided that they clearly refer to the same transaction. *Weitnauer Trading Co. v. Annis*, 516 F.2d 878, 880 (2d Cir.1975); *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953). It is required that the writing "shall completely evidence the contract which the parties made", and

> If instead of proving the existence of that contract, it establishes that there was in fact no contract or evidenced a contract in terms and conditions different

from that which the parties entered into, it fails to comply with the statute. *Poel v. Brunswick-Balke-Collender Co.*, 216 N.Y. 310, 314, 110 N.E. 619, 620 (1915), *quoted with approval in Stone v. Metropolitan Life Ins. Co.*, 12 N.Y.2d 487, 491, 240 N.Y.S.2d 754, 755, 191 N.E.2d 287, 288 (1963); *accord Lauter v. W & J Sloane, Inc.*, 417 F.Supp. 252, 258 (S.D.N.Y.1976); *Kobre v. Instrument Systems Corp.*, 54 A.D.2d 625, 387 N.Y.S.2d 617 (1976), *aff'd*, 43 N.Y.2d 862, 403 N.Y.S.2d 220, 374 N.E.2d 131 (1978).

■ Plaintiffs have admitted that the alleged contract was not to be performed within one year, but claim that there are signed writings that make the oral agreement enforceable. They argue that four documents, taken together, contain all the terms of the alleged contract: Donald Schupak's memorandum of his December 3, 1982, telephone call with Gillman; the McNeill letter of November 30, 1982; the September 30, 1982, letter to RG Group from Bojangles' franchise development director; and the standard form development franchise agreement.

The writings put forward by plaintiffs, however, contradict the alleged oral agreement. Although plaintiffs rely in part on the standard form development franchise agreement to satisfy the statute, that agreement states that it is effective only when signed, that any modification or amendment to it must be in writing, and that any agreement concerning its subject matter must be in writing and signed. These provisions run directly counter to the claim that the parties agreed to an oral contract. The Schupak memorandum, moreover, unambiguously discloses that it was a negotiating document, and that any understandings reached during the December 3rd telephone conversation concerned only what would go into the written agreement to be executed in the future.

The writings also are incomplete because they fail to specify either the precise franchise territory or the development schedule, both of which were essential terms of the contract. Failure to meet the schedule is a ground for default, and plaintiffs admit the importance of the territory issue.

The general franchise territory in Houston is indicated by the September 30th letter, but its attached map leaves the outer boundaries completely unmarked, and the letter itself says that the map is a "rough copy" which must be reviewed. No other writing offered by the plaintiffs gives any precise description of an agreed upon territory.

As for the development schedule, the plaintiffs rely on the handwritten notation "5.5 years" that appears in the margin next to a paragraph entitled "Development Schedule and Territory" in the McNeill letter of November 30th. The letter, which is typed, says in that paragraph that no development schedule had been worked out, and it suggests that consideration be given to language providing for a suspension or delay period. Plaintiffs contend that the note "5.5 years" was written by Bojangles', but even if that is true, there is no way to tell whether it refers to a development period, a suspension period, or a delay period, nor does it explain when any of these periods might begin. In short, this writing does not set out anything clear enough to serve as "complete evidence" of a definite schedule for developing up to twenty different restaurants.

Our conclusion, therefore, is that the district court was correct in holding that there is no triable issue concerning plaintiffs' failure to satisfy the statute of frauds.

C. *Promissory Estoppel.*

■ Plaintiffs also argue for recovery on the basis of promissory estoppel. In New York a claim for promissory estoppel requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance". *Ripple's of Clearview, Inc. v. Le Havre Associates*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (1982) (citation omitted).

We agree with the district court that plaintiffs have not shown any triable issue

here. Plaintiffs allege that the promise was made to them in the December 3rd telephone conversation; but, as explained above, the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract. Under those circumstances there never was "a clear and unambiguous promise" to plaintiffs that the development franchise was theirs.

Moreover, as the district court found, plaintiffs' claimed expenditures were made in expectation of, rather than in reliance on, a franchise agreement. Plaintiffs' counsel admitted in hearings before the district court that "the vast bulk" of plaintiffs' expenditures were made prior to December 3rd, the date of the alleged promise, and when the district judge pressed for details of expenditures after that date counsel could provide nothing specific. Hence the district court was correct in rejecting the promissory estoppel claim both for lack of a clear promise and for lack of reliance.

### III. CONCLUSION

The district court's judgment is affirmed.