CHRYSLER CAPITAL CORPORATION, Plaintiff,

v.

SOUTHEAST HOTEL PROPERTIES LIMITED PARTNERSHIP, Samuel H. McMahon, Jr. and SHP Capital, Inc., Defendants.

No. 87 Civ. 5069 (JMW).

United States District Court, S.D. New York.

Nov. 1, 1988.

David M. Olasov, James S. Goddard, Edwards & Angell, New York City, for plaintiff.

Vincent Alfieri, Judith L. Poller, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendants.

## OPINION AND ORDER

WALKER, District Judge:

This case turns upon whether an enforceable contract existed between plaintiff, as lender, and defendants, as borrower, for $19,750,000 in investor note financing upon the issuance by plaintiff of a commitment letter. If so, when defendants discontinued doing business with plaintiff, they breached the contract and plaintiff may recover appropriate damages. If not, the plaintiff takes nothing.

This opinion, following a bench trial at which the Court had the opportunity to receive documentary and testimonial evidence and to appraise the demeanor of the witnesses, constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

### The Parties and Other Participants

Plaintiff Chrysler Capital Corporation ("Chrysler Capital") is a Delaware corporation, having its principal place of business in Greenwich, Connecticut. Chrysler Capital engages in the business, among others, of providing financing to limited partnerships. Loren E. King, Jr. ("King") is an officer of, and the manager of merger and acquisition finance, at Chrysler Capital.

Defendant Southeast Hotel Properties Limited Partnership ("Southeast Hotel" or "SHP") is a North Carolina limited partnership, having its principal offices in Charlotte, North Carolina. Southeast Hotel was formed on May 15, 1987, for the purpose of acquiring, owning and operating up

to 15 Days Inn Hotels located in the south-eastern United States (the "Southeast Hotel Acquisition"). Defendant Samuel H. McMahon, Jr., ("McMahon") is a general partner of Southeast Hotel and a resident of North Carolina. McMahon engages in the business of operating hotels and is, directly or indirectly, the franchisee of 54 Days Inn Hotels out of the 670 Days Inn Hotels in existence, making him the largest such franchisee in the United States.

Defendant SHP Capital, Inc. ("SHP Capital") is a North Carolina corporation, with its principal place of business in Charlotte, North Carolina, and is wholly-owned by McMahon and his son, Samuel H. McMahon, III. SHP Capital is a general partner of Southeast Hotel and was organized for this purpose on May 15, 1987. Commercial Management Corporation ("CMC") is a North Carolina corporation that is wholly-owned by McMahon and members of his immediate family. CMC was formed to manage hotels acquired in the Southeast Hotel Acquisition as Days Inn Hotels under a license agreement with Days Inn of America Franchising, Inc.

Bear, Stearns & Co., Inc. ("Bear Stearns"), the New York investment banking firm, was the placement agent for Southeast Hotel, McMahon and SHP Capital in the offer and sale of $37,500,000 in limited partnership units in the Southeast Hotel Acquisition. McMahon also employed Cornerstone Capital, Ltd. ("Cornerstone"), a small New York investment banking firm specializing in real estate, in that deal.

### Factual Background

In April 1987, Cornerstone, acting on behalf of SHP, and authorized by McMahon to engage in the structuring and financing of the Southeast Hotel Acquisition, requested Chrysler Capital to generate a proposal for investor note financing for the Southeast Hotel Acquisition. The financing was intended to provide sufficient funds to purchase the hotels involved in the

acquisition; notes made by the limited partners were to serve as security for the financing.

This was not the first time that Chrysler Capital had been asked by Cornerstone to provide investor note financing for a limited partnership of which McMahon was the managing general partner. Chrysler Capital had completed a similar investor note financing as part of another transaction involving McMahon in late 1986. Since this earlier transaction is said by the parties to shed light on their subsequent dealings, we will discuss it at this point.

### The Florida Hotel Transaction

In the fall of 1986, Cornerstone contacted Chrysler Capital seeking investor note financing for the acquisition of ten hotels by Florida Hotel Properties Limited Partnership of which McMahon's CMC was general partner. Cornerstone informed King that (1) it was acting for McMahon in putting the deal together, (2) it would serve as the general administrative partner for the limited partnership, and (3) the deal had to close by year end to obtain certain tax advantages.

Subsequent discussions over several weeks led to Chrysler Capital's proposal, dated November 1986, and termed by King a negotiating document. According to the proposal, Chrysler Capital was willing to provide investor note financing up to $18,-480,000 at an interest rate of 10.75% with a 2% commitment fee payable on acceptance of the commitment. The proposal further called for a $40,000 deposit toward the commitment fee which in subsequent negotiations was reduced to $20,000. The lender would be secured, in substance, by investor notes in an amount equal to 125% of the loan and by second or third mortgages on the properties being purchased.

Negotiations over terms and conditions eventually culminated in McMahon's signed acceptance of a Chrysler Capital proposal dated November 17, 1986.[1] CMC issued a

---

1. King did not recall seeing a signed acceptance of any proposal and testified that he acted on the basis of McMahon's assurance that "you

have the deal." McMahon's signed acceptance of the November 17 proposal was telecopied to Cornerstone, but there was no proof that it was

check for a $20,000 good faith deposit to Chrysler Capital which the latter deposited. Thereupon, King began his due diligence with the intent of issuing an early December commitment so that the transaction could close before the end of the year.[2] Upon completing the due diligence to his satisfaction, King prepared an internal request for credit approval for submission to Chrysler Capital's senior management in Greenwich, Connecticut and, because the transaction exceeded $15 million, to the executive credit committee in Troy, Michigan.

On December 3, 1986, with all required approvals in hand, King issued Chrysler Capital's commitment letter to Cornerstone. The letter, termed an "offer," embodied the terms of the earlier proposal and set forth a number of additional conditions designed to further secure and inform the lender. The commitment letter concluded with the following two paragraphs:

> The funding of our commitment is subject to the execution of, including but not limited to, the Note, Loan and Security Agreement, and any other documentation deemed necessary by Chrysler Capital and its Counsel which must be satisfactory, in form and substance, to Chrysler Capital and its Counsel in their sole discretion. The deposit of $20,000 previously received by Chrysler Capital shall, with the issuance of this letter, be deemed earned by Chrysler Capital and applied to the Commitment Fee at closing. This commitment expires on January 31, 1987.

> If the above terms and conditions are satisfactory to your client, please have them indicate their acceptance by signing

and returning the enclosed copy of this commitment no later than December 8, 1986, whereupon this shall be a binding commitment for SHP to borrow and CC to lend subject to the terms and conditions herein.

In the letter's lower left corner, King designated a space for acceptance by Florida Hotel Properties.[3]

On December 31, 1986, the Florida Hotel Properties transaction closed in New York and Orlando. King, who never received a copy of his commitment letter signed by Florida Hotel Properties, closed the deal upon the verbal acceptance of Cornerstone and McMahon.[4]

### The Southeast Hotel Acquisition

When Cornerstone[5] contacted King in April 1987, Alpay characterized the investor note financing for the Southeast Hotel Acquisition as "the same deal" as the Florida Hotel Properties transaction. Alpay stated that while Bear Stearns wanted to place the investor note financing at Irving Trust, he did not expect them to be successful and that he would soon be back to Chrysler Capital. On May 15, Alpay told King that the Southeast Hotel investor note financing was now Chrysler Capital's deal; nevertheless, he placed King on notice that time was short since Bear Stearns intended to bring the limited partnership offering to market in early June and to close it no later than mid-July.

It will be useful at this point to describe the financing as it ultimately occurred bearing in mind that the details of the

---

"return[ed]" to King as called for in the proposal.

**2.** Due diligence in this transaction included an examination of the historic performance of the hotels to determine future performance projections, a review of the partnership arrangement and the returns to the partners, background checks of the hotel managers, and an examination of the financial condition of the guarantors.

**3.** At trial, defendants produced a copy, from a file maintained by defendants, of the December 3, 1986, commitment letter with McMahon's signed acceptance. There was no proof, however, that this signed commitment was ever re-

turned to Chrysler Capital as called for by its terms.

**4.** Chrysler Capital also closed a mortgage financing of $25 million for one of the hotel properties. Although a signed acceptance of the commitment "offer" for the mortgage financing also dated December 3 was found in defendants' files, there was no proof that it had been received by Chrysler Capital.

**5.** As in the Florida deal, Stephen Kratovil ("Kratovil") and Hilvan Alpay ("Alpay") represented Cornerstone's interests in this investor note financing transaction.

transaction fell into place throughout the spring of 1987. The Southeast Hotel Acquisition involved the purchase of 15 hotels in the southeastern United States by Southeast Hotel for an aggregate purchase price of $87,600,000, of which approximately $82,850,000 was to be paid in cash at the initial closing, up to $3,750,000 in cash pursuant to certain price adjustment holdbacks, and the balance of $1,000,000 by the issuance of 10 partnership units to McMahon.

To provide the necessary funds to finance the acquisition of the hotels and to guarantee additional funds for expenses, operations, and working capital, Southeast Hotel's investment bankers structured a financing comprised of (1) a non-recourse first mortgage loan in the amount of $65,000,000, and (2) $37,500,000 in limited partnership interests in Southeast Hotel. In total, 375 limited partnerships were offered pursuant to a private placement memorandum and related subscription documents (the "PPM").

The limited partners were given three ways to purchase an interest in the venture: (i) $91,260 in cash at the time of subscription, (ii) $81,260 in cash at the time of subscription, with the remainder payable in two installments of $5,000 each on June 1, 1988, and June 1, 1989, or (iii) $33,000 in cash at the time of subscription with the remainder payable in installments of $34,000 on June 1, 1988, and $33,000 on June 1, 1989. A limited partner's obligation to make deferred payments was to be evidenced by a non-interest bearing, fully recourse note. In the expectation that most limited partners would defer the payment of their investments, the PPM provided for investor note financing of up to $19,750,000.

On May 15, 1987, after Alpay told King that the investor note financing was "your deal," he faxed King a summary of the limited partnership financing terms together with financial statements and projections of the hotel properties being acquired. On May 20, 1987, as King testified, he responded with an investor note financing proposal ("May 20 proposal") addressed to Alpay and sent to Bear Stearns and "possibly McMahon." Extended negotiations ensued over the next five days between King and Alpay, McMahon and Jack Hirsch at Bear Stearns, involving among other things, security for the financing and the amount of the commitment fee. On May 26, 1987, King faxed a letter containing a revised investor note financing "proposal" ("May 26 proposal") to Alpay, McMahon and Bear Stearns.

The May 26 proposal, following the same format as the May 20 proposal, set forth the loan amount, term, rate, amount and terms of the commitment fee, amortization schedule, security and collection requirements, and a list of twenty "additional conditions." It closed with the following paragraphs:

> This letter is not a commitment but rather a proposal which outlines the terms and conditions which will form the basis for a commitment. Such a commitment is subject to approval of Chrysler Capital Corporation's Credit Committee and satisfactory documentation.

> If the proposed terms are satisfactory to your client, have them execute the enclosed copy of this letter acknowledging their acceptance and return it to me with a check for $50,000 representing their good faith deposit. If we provide a commitment substantially as set forth above, the deposit shall have been earned and should we close the transaction, will be applied to the Committee Fee. If we do not provide the commitment, the deposit will be refunded.

The signature page of this proposal included a designated space for acceptance by Southeast Hotel Properties.

At trial, King testified that the May 26 proposal embodied the results of the prior negotiations and that its terms were confirmed by McMahon in a telephone conversation on May 26 as satisfactory, except for the requirement that half of the $358,750 commitment fee was payable upon "acceptance of commitment." King testified that McMahon said, "I was counting on paying that out of the proceeds of the closing. I will have to pay that out of my own pocket.

Don't make me pay it now. You know me, Ed. We have got a deal. We will close with you." King further testified that he acceded to McMahon's request and deleted the partial payment requirement.

McMahon recalled his May 26 telephone discussion with King differently. While testifying that he got King to remove the partial payment requirement, he denied that he gave any assurances that he would close the deal with Chrysler Capital. Rather, McMahon testified that in yielding to King's request for a $50,000 good faith deposit he told King, "If I pay you $50,000, Ed, you know I can do what I want to do." McMahon also testified that negotiations continued concerning several other terms of the May 26 proposal focusing on, among other items, the security Chrysler Capital was to receive and a cap on legal fees.

After the May 26 King–McMahon telephone conversation, King began "six or seven days" of due diligence based on financial and descriptive materials furnished by Bear Stearns. On June 3, King issued an internal "Request for Credit Approval" to Chrysler Capital's officers whose approval of the transaction was required. Other than the elimination of the requirement for partial payment of the commitment fee, the description of the deal accompanying the Request for Credit Approval did not embody the items that McMahon testified he had requested of King. However, it did contain additional conditions, not set forth in the May 26 proposal, that were ultimately included in the final commitment letter.

Since the amount of the loan exceeded $15 million, King was required to obtain the approval of the executive credit committee of Chrysler Capital in Troy, Michigan, as well as the senior management of Chrysler Capital in Greenwich, Connecticut.

Upon receipt of the latter's approval, Bear Stearns printed, but did not distribute, final copies of the PPM incorporating the terms of the investor note financing negotiated as of May 26 but omitting Chrysler Capital's name. Nevertheless, the subscription documents accompanying the PPM included an "Estoppel Letter" naming Chrysler Capital as the "Interim Lender." Distribution of the PPM did not occur until a final commitment was issued by Chrysler Capital.

McMahon, did not sign the May 26 proposal although he mistakenly stated that he did so in a letter [6] he wrote the following year to Lee Iacocca, the Chairman of Chrysler Corporation, Chrysler Capital's parent, in an effort to settle this action. On June 8, 1987, CMC, at McMahon's request, issued a check for the $50,000 good faith deposit called for in the May 26 proposal's final paragraph. King received the check the following day and deposited it.

King obtained all necessary internal approvals and, in a letter to Alpay dated June 11, 1987, he set forth, on Chrysler Capital's behalf, the terms of Chrysler Capital's commitment ("June 11 commitment letter"). Following the general format of the May 26 proposal, the June 11 commitment letter stated the amount of the loan, its term and rate, the commitment fee, the amortization schedule, security and collection terms, and twenty-five "Additional Conditions." Not surprisingly, these terms and conditions generally tracked those set forth in the June 3 Request for Credit Approval, and, as noted with respect to that document, they included conditions not embodied in the May 26 proposal and not discussed between King and McMahon.

The June 11 commitment letter commenced by stating that Chrysler Capital "is delighted to offer its commitment for the following financing to your client, South-

---

6. This letter, dated, March 21, 1988, stated, in pertinent part:

I want to work with you to settle, out of court, a potentially costly matter. In May of 1986, I began discussions with your Chrysler Financing Office in Greenwich, Connecticut, about financing a business venture whereby I was going to place a number of Days Inns (which I own) in a general-limited partner-

ship arrangement. While I did sign a letter of proposal, when the letter of commitment came, it was not as agreed upon, was not competitive with other possibilities, thus I did not sign it. Subsequently, I arranged other financing. Thereafter, to my surprise, I found that Chrysler had brought suit against me. This is particularly surprising since the only documentation on either side is verbal.

east Hotel Properties" and closed with the following paragraphs:

The funding of our commitment is subject to the execution of the Note, Loan and Security Agreements, and any other documentation deemed necessary by CC and its counsel which must be satisfactory in form and substance to CC.

This commitment to lend is valid only through 9/30/87. The $50,000 deposit previously submitted by SHP is now deemed earned with the issuance of this commitment and will be applied to payment of the Commitment Fee at closing.

If the above terms are satisfactory to your client, please have them execute the enclosed copy of this letter and return it to us whereupon this shall become a binding commitment for SHP to borrow and CC to lend subject to the terms and conditions herein.

Following King's signature, the letter designated a space for acceptance by Southeast Hotel Properties consisting of the notation "Accepted: Southeast Hotel Properties" with lines for the signature and title of the accepting officer and the date. McMahon never signed the June 11 commitment letter and subsequently informed King that he intended to close the investor note financing with North Carolina National Bank ("NCNB"). McMahon subsequently closed the transaction with NCNB.

## Discussion

Chrysler Capital argues that notwithstanding McMahon's failure to sign the June 11 commitment letter, the commitment embodied in that letter had been orally agreed to between King and McMahon on May 26. As further evidence of McMahon's acceptance of the commitment, plaintiff points to the payment of $50,000 to Chrysler Capital as a good faith deposit. Since a "deal" was reached on May 26 and the terms of that "deal" were understood by King and McMahon, plaintiff contends that the mutual expectations of the parties should be enforced by finding (a) that Chrysler Capital's commitment was binding on defendants and (b) that defendants breached the agreement by rejecting the commitment and concluding the investor note financing with NCNB.

Defendants argue that there was no binding commitment since McMahon signed neither the May 26 proposal nor the June 11 commitment and both required his signature for acceptance. Defendants argue further that whether or not the May 26 proposal was accepted, no binding commitment was reached since McMahon never accepted the June 11 commitment.

In approaching this case, the Court is mindful of the fundamental tenet of contract law that enforceable legal rights do not arise from contract negotiations until both parties consent to be bound or, in any event, manifest that consent to each other. More is needed than even mutual agreement on all terms under negotiation; there must be a manifestation of a consent to be bound to those terms as of a point in time before a contract may be found. *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). This is true even where the parties enter a preliminary agreement if such an agreement were made with the understanding that neither side would be bound until final agreement was reached. In several recent cases, the Court of Appeals for the Second Circuit has recognized that binding obligations may not arise even though various forms of preliminary assent have been reached, particularly where the parties have indicated an intent not to be bound absent a signed document. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir.1984); *Reprosystem, supra.*

On the other hand, where the parties have reached an agreement intended to be binding but have failed to develop complete documentation, or have left open certain details for further negotiation, an enforceable contract may be found. Courts should not frustrate the expectations that arise out of an intended contractual agreement notwithstanding its informality or the need to negotiate further details. *V'Soske v.*

*Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

Judge Leval of this court recently considered these issues in *Teachers Insurance and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987). There he identified two types of situations in which a preliminary agreement may be enforceable according to its terms even though a more elaborate agreement is contemplated: where the parties have consented to be bound as to all essential terms and little, if any, further negotiation is required, as was the case in *V'Soske;* or where the parties have consented to be bound as to essential terms and significant terms remain for future negotiation. In the latter case, the parties do not yet have an enforceable contract as to all terms but do have a further duty to negotiate in good faith toward resolving those that are left unresolved. It was this latter situation that Judge Leval found to be present in *Teachers Insurance,* a case that Chrysler Capital contends is supportive of its position in this case.

In the final analysis, the issue boils down to one of intent. The Court must determine whether or not, at some point in time prior to the execution of a final agreement, the parties manifested an intent to be bound in contract and, if so, what the scope of their agreement was.

In *Winston,* 777 F.2d at 80, the Court of Appeals delineated four principal factors for a district court to consider in resolving the issue of intent:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing ... These factors may be shown by "oral testimony or by correspondence or other prelimi-

nary or partially complete writings." (citation omitted.)

Before turning to an examination of these factors, however, it is necessary to determine whether the parties reached even a preliminary agreement in this case. The defendants argue that the May 26 proposal was never accepted in writing and thus no preliminary agreement was reached. The Court disagrees.

■ While Chrysler Capital could point to no signed acceptance of the May 26 proposal and defendants denied that there was one, its absence was plainly an oversight. On all of the evidence, the Court finds that the minds of King and McMahon met in agreement over the May 26 proposal as modified in their conversation on or about that date by the deletion of the requirement that half of the commitment fee be paid on acceptance. King credibly testified that with that change all of the written terms of the May 26 proposal were accepted by McMahon, and McMahon conceded that "the changes we wanted had been taken care of." (McMahon Tr. at 42.)[7] In addition, McMahon subsequently sent King the $50,000 payment that the proposal required. Moreover, when McMahon later erroneously wrote to Iacocca that he had signed the May 26 proposal, he provided compelling evidence that, whether or not his memory was accurate as to signing the document, he had accepted its terms in his own mind.

The Court's determination that the May 26 proposal was accepted by McMahon, while essential to plaintiff's claim, only takes the plaintiff part way. By its own terms, the May 26 proposal was "not a commitment but rather a proposal which outlines the terms and conditions which will form the basis for a commitment." Whether the subsequent commitment is enforceable by Chrysler Capital thus depends upon an analysis of the factors delineated in *Winston.*

---

**7.** References to an individual followed by "Tr." are to the page of that individual's testimony at trial.

1. *Was There An Express Reservation of the Right Not To Be Bound Absent A Signed Writing?*

Whether there is an express reservation not to be bound in the absence of a signed writing is a factor to be accorded "considerable weight." *R.G. Group*, 751 F.2d at 75. Where a party explicitly states that it reserves the right to be bound only when a written agreement is signed,

> "[c]ourts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement."

*Id.* New York courts have consistently held that if there is no intent to be bound absent a signed writing, there cannot be a binding contract. *Winston*, 777 F.2d at 80 ("If either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract."); *R.G. Group*, 751 F.2d at 74; *Reprosystem*, 727 F.2d at 261; *V'Soske*, 404 F.2d at 499; *Municipal Consultants & Publishers, Inc. v. Ramapo*, 47 N.Y.2d 144, 148, 417 N.Y.S.2d 218, 390 N.E.2d 1143 (1979); *Scheck v. Francis*, 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970); *Schwartz v. Greenberg*, 304 N.Y. 250, 254, 107 N.E.2d 65 (1952). The party invoking this rule must show either, "that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed." *Reprosystem*, 727 F.2d at 261.

This factor was critical to holdings that preliminary agreements could not be enforced in *R.G. Group, Reprosystem* and *Winston* where preliminary drafts during negotiations or the final agreement conditioned acceptance upon written execution. *R.G. Group*, 751 F.2d at 76; *Reprosystem*, 727 F.2d at 262; *Winston*, 777 F.2d at 81. In *Teachers Ins. and Annuity Ass'n*, the preliminary agreement that Judge Leval upheld as enforceable expressly bound the parties to complete the ultimate transaction "[u]pon receipt by [Teachers] of an accepted counterpart of this letter." In that case, the signed counterpart was duly furnished and thus formed the linchpin for Judge Leval's determination of enforceability.

■ In the case at bar, the June 11 commitment letter is unequivocal. Chrysler Capital reserved the right to be bound only upon the execution of a copy of the letter and its return to Chrysler "whereupon this shall become a binding commitment for SHP to borrow and CC to lend subject to the terms and conditions herein." The letter further invited written acceptance by characterizing itself as an "offer" and designating a specific space for written acceptance.

2. *Context of the Negotiations and Whether All of the Terms Had Been Agreed Upon.*

■ Faced with such unhelpful language in the June 11 commitment letter, Chrysler Capital asks this Court to place considerable emphasis on the context of the negotiations and the terms of agreement reached on or about May 26. While the Court has found that the May 26 proposal was indeed accepted with the one modification as to the payment of the commitment fee, that proposal expressly stated that it was "not a commitment but rather a proposal which outlines the terms and conditions which *will form* the basis for a commitment." (Emphasis added.) Chrysler Capital argues that this language was overridden by McMahon's oral statement to King on May 26, to the effect that "We have got a deal" and "We will close with you." (King Tr. at 38.) Thus, in light of the successful Florida Hotel transaction, Chrysler Capital contends that the parties intended to be bound in a final agreement by the May 26 proposal. After a careful review of the evidence produced at trial, the Court cannot find that such an intent existed.

First, we note that McMahon flatly denies King's testimony. Second, we conclude that any such statements of McMahon were said in the context of negotiating

away the requirement that half of Chrysler Capital's fee be payable at acceptance of the commitment. McMahon's statements that "We have a deal" and "We will close with you" are just as consistent with the assurance that Chrysler would get all its money at closing if the commitment were accepted, as with one that McMahon was now accepting the commitment. The May 26 proposal, the only document the parties were referring to, expressly disclaimed that it was a commitment. Moreover, the document's partial payment provision, deleted for other reasons, contained an express reference to a point in the future when the commitment would be subject to acceptance. There is no compelling evidence that the parties intended to be bound in contract as of the May 26 negotiation. Again, clear evidence to the contrary is provided by Chrysler Capital's subsequent commitment letter that expressly reserved acceptance upon McMahon's signing of that letter. King's explanation that the June 11 reservation language was irrelevant boilerplate on his word processor cannot suffice. Notwithstanding what King may have thought after May 26 about the existence of a binding deal, his June 11 commitment letter conveyed the opposite message to McMahon.

Moreover, there is compelling proof that even Chrysler Capital did not consider itself bound to lend on the basis of the terms contained in the May 26 proposal. On June 3, King sought and obtained approval from Chrysler Capital's management for the investor note financing based on several conditions that were not present in the May 26 proposal. These included requirements that SHP provide quarterly financials, return of capital be applied to prepay the loan, 375 units be subscribed instead of 250 units unless Chrysler Capital determined that a lesser number would provide adequate capitalization, other aggregate debt of $65 million would not be limited to first mortgage financing, CMC provide certain

financials, termination and disposition fees be subordinate to the loan, and Chrysler Capital shall have received and reviewed to its satisfaction the final draft of the offering memorandum. While some of these conditions might well have been agreed to by McMahon as pro forma, others that increased Chrysler Capital's security requirements might not have been. There is no evidence that any were discussed with McMahon. The fact that Chrysler Capital felt free to change the conditions of the loan from the May 26 proposal is clear evidence that Chrysler Capital did not consider itself bound thereby.

Chrysler Capital also argues that the parties' intent that the June 11 commitment be binding upon them is evidenced by Bear Stearns' issuance of the PPM which, a Bear Stearns' witness testified, would not have occurred unless Bear Stearns' believed that a binding commitment had been agreed to. The Court rejects this argument. The short answer is that Bear Stearns' belief, while it may suggest the existence of evidence directly supporting plaintiff's position, is no substitute for such evidence. Further, the language of the PPM plainly contradicts Bear Stearns' belief. In the section entitled "Financing Arrangements," the PPM characterizes the terms of the investor note financing as a "proposal" [8] and elsewhere states that "a commitment letter" has been "received." [9] Nowhere does the PPM indicate that the commitment is binding. Finally, the May 26 proposal and the June 11 commitment letter indicate that a binding agreement was dependent upon a signed acceptance of the latter, and Bear Stearns' belief that a binding commitment existed cannot change that fact.

Chrysler Capital also contends that it would not have undertaken due diligence and moved the proposal through the approval process had it not believed a binding agreement existed. This argument must also be rejected.[10] The May 26 proposal

8. Exhibit 39 at 78.

9. *Id.* at 76.

10. In its pre-trial submissions, plaintiff also sought relief under the theories of promissory estoppel and breach of the duty of good faith. The promissory estoppel argument is unavailing for the reasons discussed in *Reprosystem,* 727

made clear that no binding commitment could exist except upon completion of the approval process. Moreover, that proposal, together with the June 11 commitment letter, stated that the down payment was to compensate Chrysler Capital for this work and that upon issuance of the June 11 commitment the $50,000 was earned. Thus, the clear evidence established that due diligence and internal approvals were a prerequisite to any final commitment, not the reverse. Finally, the testimony of the expert flatly contradicted King's contention that a binding commitment is obtained prior to seeking credit approval.

### 3. *Whether there has been Partial Performance.*

■ Chrysler Capital claims as partial performance evidencing a binding final agreement on May 26 its due diligence from May 26 to June 3 and preparation of the June 3 Request for Credit Approval to its internal management. Such activities, however, are fully consistent with the Court's finding of acceptance of the May 26 proposal and are not inconsistent with a finding that no commitment was accepted. Due diligence and approvals were contemplated in the May 26 proposal as prerequisites to a final offer of commitment. Indeed, provision was made in that proposal as well as in the June 11 commitment letter for compensation of $50,000 which we find was to cover the approval process and due diligence required to issue the commitment.

In other words, the activities that Chrysler Capital claims as partial performance were fully contemplated by the terms of the May 26 proposal. Unlike the partial performance upon which the Second Circuit relied in *V'Soske*, these activities were not in furtherance of a final agreement to lend and to borrow in the sense that their ac-

ceptance by the defendants evidenced that a final agreement must have been reached. Rather, they were a necessary prelude to the offer of a final agreement which had yet to be accepted.

### 4. *Whether the Agreement is of the Type Usually Committed to Writing.*

The final factor set forth in *Winston* is whether the agreement is usually of the type committed to writing. The Court has no hesitation in finding that to be the case here. The Court heard credible expert testimony from an independent banking officer that agreements such as the one at issue are regularly signed. This is, of course, consistent with the fact that, as evidenced in this case, such transactions are complex and require extensive negotiation. Moreover, it is supported by the fact that every one of the numerous Chrysler Capital proposals or commitment drafts, according to their terms, required a signed acceptance to be binding.

Chrysler Capital argues that a practice of operating on unsigned documents existed between the parties and points to the fact that it received no signed commitment in the Florida Hotel transaction the previous December. While this argument is undercut somewhat by defendants' production of signed, albeit not delivered, copies of the November 17 proposal and December 3 commitment letter, the Court does not rely on them to reject Chrysler Capital's argument. Even if none of the agreements in the Florida Hotel transaction had been signed—a fact which has not been established in this case, the Court is not persuaded from that isolated instance, in the face of industry practice to the contrary, that a pattern of operating on unsigned documents had been established. Again, the most powerful evidence cutting

F.2d at 264–65. The latter argument fails since the Court has concluded that the commitment was never accepted by McMahon. Accordingly, the authority on which plaintiff relies is inapposite. *Teachers Insurance,* 670 F.Supp. at 507 ("the commitment letter constituted a binding enforceable agreement that obligated both parties to negotiate in good faith to resolve the open terms and documents.") Here, however, McMahon remained free to reject the commit-

ment. *Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606, 611 (1960), *aff'd* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961) ("When ... [there exists] no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of minds deferred until some future time, either party may withdraw with impunity prior to that time.").

against Chrysler Capital on this score is its own language in the June 11 commitment letter reserving the right not to be bound absent receipt of a signed acceptance.

Although we are constrained by the law to rule in favor of the defendants, the Court is mindful that McMahon abused his business relationship with plaintiff. In good faith and with the clear expectation that McMahon would close with Chrysler Capital, King continued to press forward with the deal only to be frustrated by McMahon's decision to close with NCNB. King's unilateral expectations, however, were not mirrored in the documents he prepared and on which McMahon relied. This opinion should not be read as condoning McMahon's sharp business practice of leading Chrysler Capital along while secretly negotiating with another lender. Nonetheless, the law of this circuit mandates a determination that a contract was not reached by the parties to this action.

### Conclusion

Upon a full consideration of the circumstances of this case, the Court holds that while the defendants by their conduct did accept the May 26 proposal, they did not agree or intend to agree to a final commitment to borrow on the terms of that proposal. The final commitment dated June 11 was never accepted in writing by the defendants as was required by the terms of that commitment as drafted by plaintiff. Thus, no contract to lend and to borrow was reached. Accordingly, judgment will be entered for the defendants dismissing the complaint and it is so ordered.